UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE

| JOHN L. SIMONIS, | ) |
| --- | --- |
| | ) |
| Plaintiff, | ) |
| | ) CAUSE NO. 1:15-CV-235-PPS |
| v. | ) |
| | ) |
| CITY OF FORT WAYNE, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This employment-related disputed arises from the City of Fort Wayne's decision not to promote one of its long-time employees, Plaintiff John L. Simonis. Simonis had worked for the City for 27 years when he applied for a promotion from his position as an Engineering Inspector to the position of Right of Way Inspector. As part of the application process, the City required Simonis to take three exams, two of which tested his computer skills. Based on Simonis' performance on those exams as compared to that of another internal applicant, the City gave the other applicant, who is considerably younger than Simonis, the position. It is that decision that prompted Simonis' lawsuit against the City alleging that the failure to promote him was because of his age. The City now seeks summary judgment claiming that the decision was based on the test scores and only the test scores and, as such, Simonis' claim of age discrimination fails. Because there are genuine issues of material fact that exist in this matter, the City's motion is denied.

**Background**

At the time that the hiring decision at issue in this action was made, John L. Simonis was 58 years old. [DE 3 at 3.] Simonis was hired by the City of Fort Wayne's Transportation Engineering Services – Technical Services Department in May of 1987. [DE 27-5 at 2; DE 28-7 at 1.] Until July 13, 2015, Simonis held the position of Engineering Technician II, also known as an Engineering Inspector. [DE 27-5 at 2.] On February 24, 2014, the City posted an opening for a Right of Way ("ROW") Inspector position within its Transportation Department. [DE 28-5 at 1-2.] Simonis submitted his application for the position on March 3, 2014. [DE 28-7.] Simonis felt he deserved the promotion to the ROW Inspector position due to his 27 years of employment with the City. [DE 1 at 1.]

Six people submitted applications for the ROW Inspector position, including Simonis. [DE 27-11 at 6.] Brad Fisher, another Engineering Technician II with the City since October 22, 2007, also applied for the position. [*Id.*; 28-8.] Due to the collective bargaining agreement between the City and the union, which required the Department to consider current employees first for vacant positions, Simonis and Fisher were given first consideration for the open ROW Inspector position. [DE 27-9 at 2.] This is when the matter get complicated.

Normally, the Manager of the City's ROW Department makes all of the hiring decisions. But there was no ROW Manager at the time of the ROW Inspector position posting due to the prior Manager retiring in December 2013. [DE 27-9 at 1-2.]

Therefore, Shan Gunawardena, the City Engineer, was responsible for hiring someone to fill the vacant ROW Inspector position. [*Id*. at 1; DE 27-12 at 3.] Gunawardena decided to adopt the practice of administering departmental skills tests when making hiring decisions, which is what Mario Trevino, the City's Transportation Engineering Manager and Simonis' supervisor for more than six years, commonly practiced. [DE 27-9 at 2; DE 27-12 at 1-2.] In fact, Trevino previously administered such a test to Simonis in 2009 when Simonis applied for an open Project Coordinator position, for which Simonis was disqualified due to a poor test score. [DE 27-12 at 2.]

Gunawardena assigned Kyle Winling, the Assistant City Engineer, the task of developing a skills test for the duties of the ROW Inspector position. [DE 27-9 at 2.] Trevino gave Winling sample skills tests that he had used in the past. [DE 27-12 at 3.] Winling crafted a departmental skills test consisting of thirty questions pertaining to the ROW Inspector position that garnered Gunawardena's approval. [DE 27-6 at 2; DE 28-15.]

The departmental skills test—the "ROW Inspector Test"—contains a mixture of true/false questions, yes/no questions, and short answers. [DE 28-15; DE 28-16.] Questions range from naming types of permits issued by the ROW Department to naming the color of paint used to mark city underground sewer lines and underground communication lines. [*Id*.] Point allocation is discussed in the summary at the bottom of the test. [DE 28-15 at 4; DE 28-16 at 4.] Each test question is worth three points a piece, while the two bonus questions are worth five points a piece. [*Id*.] A passing

3

score for the skills test would be 70%, or 70 points out of a possible 100 points, which is also discussed in the summary. [*Id.*; DE 27-6 at 3.]

In addition to the departmental skills test, Gunawardena decided to incorporate a computer skills test to the job application because the use of computers is becoming increasingly popular within the Department. [DE 27-5 at 19.] Gunawardena turned to Mona Clapper, an Administrative Assistant in the City's Human Resources Department, for help in selecting a computer skills test already used by other departments in the City related to the skills required for the ROW Inspector position. [DE 27-11 at 2.] The inspectors at the Transportation Administration Department use a program called Acella, but the HR Department does not have a test for Acella. [*Id.*] Instead, Gunawardena decided to administer two additional tests, one for Microsoft Word and another for Microsoft Excel. [DE 27-11 at 2, 7-10.] Both tests were computer simulations, each containing thirty separate commands. [*Id.* at 7-10] Both tests contained questions that are labeled as basic, intermediate, and advanced. [*Id.*] The results show the amount of time each participant took on each specific question. [*Id.*] Both tests were broken down into the following categories: General Commands and Properties, Formatting and Editing, Page Layout, Insert Tools, Application Tools, and Review Options. [*Id.*] A breakdown of the participant's categories scores were provided as percentages. [*Id.*] Similar to the departmental skills test, Gunawardena decided a passing score would be a 70% on each of the computer skills tests. [DE 27-9 at 2.]

Once Gunawardena established the three tests that he was going to use in determining whom to hire for the ROW Inspector position, both Simonis and Fisher had to complete each of the tests. [DE 27-9 at 2.] Clapper administered the Microsoft Word and Microsoft Excel tests to both men. [DE 27-9 at 3; DE 27-11 at 7-14.] Simonis was given the departmental skills test by Winling, while Gunawardena administered it to Fisher. [DE 27-9 at 3.] On the Microsoft Word test, Simonis scored 20 out of 30 questions correctly while Fisher scored barely better; he got 21 out of 30 correct. On the Microsoft Excel test, Simonis scored 19 out of 30 while Fisher scored 21 out of 30. [DE 27-11 at 7-10, 11-14.] It took Simonis approximately forty minutes to complete the Microsoft Word test and one hour and seven minutes to complete the Microsoft Excel test. [*Id.*] Fisher spent approximately twenty-five minutes on the Microsoft Word test, while only spending eighteen minutes on the Microsoft Excel test. [*Id.*] Simonis scored a 61 on the departmental test while Fisher scored a 76. [DE 28-15; DE 28-16.] To summarize, Fisher scored higher than Simonis on all three tests, but just barely so on two of the tests. Shortly after the test results were in, Gunawardena offered Fisher the ROW Inspector position. [DE 27-9 at 3.]

Gunawardena claims his decision was solely based on the three test scores, as Fisher had higher scores than Simonis on each test. [*Id.*] Gunawardena believed that the test scores showed who was the most qualified candidate for the position. [*Id.*] Gunawardena claims he did not consider the age of either candidate during the hiring process for this position, as Simonis argues. [DE 26 at 5; DE 1 at 1.] Simonis, however,

5

feels that the computer tests were designed to favor younger candidates and are the sole reason for him not getting the job. [DE 26 at 6; DE 27-5 at 23.]

In response to Gunawardena's decision to hire Fisher for the position, Simonis filed a grievance through his union on April 14, 2014. [DE 28-12.] Further, on September 16, 2014, Simonis filed a charge of discrimination with the Equal Employment Opportunity Commission claiming the decision not to give him the ROW Inspector position was based solely on his age. [DE 27-3.] Shortly after, Simonis' union and the City negotiated a settlement of his grievance. [DE 27-5 at 25-26.] The settlement stated that the City would give Simonis a ROW Inspector position on the next opening or by September 30, 2015, whichever occurred first. [*Id*. at 25.] Simonis claims that during the negotiation, the City agreed to give him the position no later than April 1, 2015 if he agreed to withdraw his charge of discrimination with the EEOC. [*Id*. at 26-27.] Simonis declined the offer. [*Id*.] Eventually, Simonis was given the ROW Inspector position on July 13, 2015, when the previous ROW Inspector, Larry Whitt, retired. [*Id*. at 26.]

After Simonis filed his EEOC charge, but before he was given the ROW Inspector position, Simonis filed an amended charge of discrimination with the EEOC claiming that he had been harassed in a variety of ways due to his age and that the City retaliated against him by not guaranteeing him the ROW Inspector position by April 1, 2015. [DE 27-4; DE 27-5 at 27. ] Simonis, however, never made any complaints to his supervisor,

Trevino, or the Human Resources Department about the alleged harassment. [DE 27-12 at 2-3; DE 27-10 at 1.]

After receiving a Right to Sue letter from the EEOC, Simonis filed this action on August 26, 2015. [DE 1.] Simonis originally alleged counts of age discrimination (what appear to be disparate treatment and hostile work environment claims) and retaliation under the ADEA. [*Id.*] Simonis has since conceded his hostile work environment claim and his ADEA retaliation claim. [DE 28 at 1 n.1.] The City moved for summary judgment in this matter, arguing that Simonis fails to show any evidence that the City relied on age when hiring Fisher instead of him as the ROW Inspector in 2014. [DE 26 at 24.] Further, the City argues that Gunawardena's decision was based on the mens' performance on the three tests administered, all of which Fisher passed and Simonis failed.

**Analysis**

The ADEA provides that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). Simonis' lone remaining claim in this case is that the City failed to promote him because of his age, stating a claim of "disparate treatment" under the ADEA. The City now seeks summary judgment on that claim. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

7

Civ. P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, I must construe all facts and draw all reasonable inferences from the record in the light most favorable to the nonmoving party. *Id..* A nonmoving party like Simonis, however, is not entitled to the benefit of "inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (citations and quotations omitted).

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit abandoned the dichotomy of direct and indirect evidence on summary judgment in employment discrimination cases and held that, the "sole question that matters" is "[w]hether a reasonable juror could conclude that [the plaintiff] would have kept his job if he had a different ethnicity, and everything else had remained the same." 834 F.3d 764, 766 (*citing Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994)). The Court also jettisoned the "convincing mosaic" as a legal standard. *Id.* Rather, the Court held that all evidence should be considered together to understand the pattern it reveals. *Id.* (discussing *Troupe*). The Court held that "district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Id.* at 765. Finally, the Court clarified that its decision did not concern the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or any other burden-shifting framework. 834 F.3d at 766.

*McDonnell Douglas* provides a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases . *David v. Board of Trustees of Community College District No.,* 508, 846 F.3d 216, 224 (7th Cir. 2017). Although *Ortiz* was a Title VII case, the same procedures on summary judgment apply in employment discrimination cases brought under the ADEA. *See David v. Board of Trustees of Community College District No.,* 508, 846 F.3d 216, 224 (7th Cir. 2017) (applying *Ortiz* to an ADEA claim).

There remain too many genuine disputes as to material facts for me to grant summary judgment. One major issue here is the legitimacy of the decision to use tests in making the decision of whom to promote to ROW Inspector. The Right of Way Department had never, and has since never, used tests as part of the ROW Inspector selection process. [DE 28 at 3-4.] Why did they use tests in this instance? The City argues that Gunawardena was the one-time decision maker for the hiring decision at issue and wanted to make sure he selected the most qualified candidate for the position, especially given the fact that he anticipated complete turnover in the City's Right of Way Department, and decided to use tests to assist him in making that determination. There is evidence, however, that Gunawardena may not have been the true decision maker, or at least was influenced by Kyle Winling, who plainly favored Fisher. Both Harvey Meyer and Larry Whitt, the other ROW Inspectors at the time the relevant hiring decision was made, say that they believed Winling, not Gunawardena, to be their supervisor after Rick Orr retired and before his position was filled. [DE 28-2 at 1-2; DE

9

28-3 at 1.] Whitt says that when the ROW Inspector position was posted, it was his understanding that Winling was in charge of the hiring process and the hiring decision. [DE 28-3 at 2.] And what's more, it's uncontested that Winling is the one who developed the departmental skills test for the ROW Inspector position. [DE 29-7 at 2.]

Meyer and Whitt both believe that the reason testing was used for this one and only ROW Inspector hiring decision was to weed-out older applicants who maybe were not as tech-savvy as younger applicants because requiring Word and Excel proficiency tests does not correlate to the job duties of a ROW Inspector. [DE 28-2 at 3; DE 28-3 at 2.] Meyer and Whitt say that Fisher and Winling worked together at the Allen County Highway Department and were friends and Meyer believes they are approximately the same age. [DE 28-2 at 3-4; DE 28-3 at 3.] Whitt says that Fisher is considered "the Golden Boy" by Winling and Gunawardena. [DE 28-3 at 3.]

It also gives me pause that the City asserts that these tests, specifically the Word and Excel tests, somehow test for the relevant qualifications of the candidates when neither the job bid nor the job description said a peep about applicants needing to be proficient in Word or Excel. [DE 28-5, 28-6.] This is suspicious given the fact that the City's own policy states that "[a]ll candidates requiring typing/keyboarding/skills testing must meet the qualifications as stated in each job description." [DE 28-11.] So if proficiency in Word and Excel was not listed in the job description and the two other long-term ROW Inspectors say that Word and Excel proficiency does not correlate to the job duties of a ROW Inspector, why were the candidates tested for it?

I question whether the content of Word and Excel tests actually corresponded to the ROW Inspectors' actual use of those programs, if any. For example, Simonis testified that he uses Microsoft Word every day in his current position as ROW Inspector, DE 27-5 at 19, but there is a difference between the ability to *use* a computer program and complete professional proficiency in a computer program. While Simonis may have been able to draft memoranda and reports in Word at the time he took the Word test, possessing a level of skill necessary for a ROW Inspector position, he may not have been able to complete more sophisticated tasks in Word, causing him to fail the test. Simply put, the City has provided no evidence that the type of proficiency for which it tested with its Word and Excel tests is required for the ROW Inspector position, and Simonis has provided evidence to the contrary. It seems that the City may have used pre-existing Word and Excel tests that tested candidates for positions requiring a higher level proficiency in those programs than ROW Inspectors and potentially weeded out a qualified candidate.

Furthermore, there is evidence that City's process in administering the tests and using them as the determinate for the ROW Inspector position violates the City's own policy. The City's policy requires that:

> All appropriate skills testing or verifications required in the specifications may be conducted in the Human Resources Department. Only properly validated, unbiased testing will be permitted. Testing will be reviewed by Human Resources staff for all candidates and positions for which validated testing exists to ensure tests are valid and unbiased.

[DE 28-11 at 1.] No one in HR reviewed the departmental skills test before it was administered to Simonis and Fisher and used as part of Gunawardena's justification for promoting Fisher and not Simonis. Furthermore, according to the City's policy, Policy 203: Selection Process and Employment/Promotion, several things are supposed to be considered in evaluating and selecting an employee for a promotion: ability to perform the job, previous performance appraisals, educational qualifications, experience, compatibility with the position as defined in job specifications, and longevity to be eligible to bid. [*Id.* at 2.] If Gunawardena only took into account the test scores, as he asserts, that means he failed to consider other requisite factors, most importantly experience, which the tests could not measure.

The City's process here also violates the relevant collective bargaining agreement. Policy 203 requires that "[i]nternal bids for bargaining unit positions will follow the process outlines in the appropriate collective bargaining agreement." [*Id.* at 1.] Article 9, Section 1 of the collective bargaining agreement mandates that "an employee with the minimum qualifications and greatest seniority shall be given preference in filling job vacancies." Again, the City does not assert that Simonis did not meet the minimum qualifications and there's no dispute that he had much greater seniority than Fisher. At the time the ROW Inspector position became available, Simonis had 27 years of experience working for the City in the Transportation Engineering Department, DE 28-7, while Fisher had only worked in that department for 7 years, DE 28-8. The City doesn't contest that Simonis was qualified for the job, and it

can't given the fact that he was awarded the position in July 2015. So why is it that he was not given the promotion, in violation of both the collective bargaining agreement and Section 203 of the City's policy, and told by the City that it chose to hire "a candidate whose experience more closely parallels the immediate situation [it has] in this area," when Simonis had 20 more years of experience in the same area as Fisher? [*See* DE 28-10.] That is a question that I cannot definitively answer and must leave for the jury.

In addition, even if the use of the tests was legitimate and not in violation of the City's Policy and the collective bargaining agreement, the relative performance of Fisher versus Simonis on the exams does not appear to mandate the hiring of Fisher over Simonis, as the City would have me believe. While the City is correct that Fisher scored higher than all three of the administered tests, it glosses over the nominal differential between their test scores. Fisher answered 1 more questions correct on the Word test, 2 more questions correct on the Excel test, and 5 more questions correct on the Departmental Skills Test than did Simonis. [DE 27-11 at 7-10; DE 27-11 at 11-14.] This may be a meaningful differential, but it is too close in my judgment to be dispositive. It will be for the jury to sort out whether the City was being truthful when it said it relied solely on the test results while turning a blind eye to all other considerations.

All of the evidence that I discussed and the unanswered questions it raises is sufficient to defeat the City's motion for summary judgment. I find that in looking at the evidence as a whole—that an older, much more experienced candidate was denied a

promotion for a younger candidate, who may have had a relationship with individuals involved in making the hiring decision, which was made using a process never used before and never used again, that was in violation of the City's policy and the collective bargaining agreement and appears not to have focused on proficiency in areas required for the position—a reasonable juror could conclude that Simonis would have received the promotion had he been younger and everything else had remained the same.

And when you layer on top of all of that evidence the age-related incidents Simonis claims he experienced, it becomes even more likely that a juror could come to that conclusion. Simonis testified regarding an incident when he found a note with handwriting stating "Hi I'm Old" on the back of his jacket and a Cialis pamphlet is his work area some time around November 2014. [DE 28 at 11; DE 28-20 at 4, 6.] While Simonis has no idea who was responsible for either of these things, DE 28-20 at 5, 8, the incidents give color to his claim that age was the reason the City failed to promote him.[1]

While any one of the issues that I discussed above alone may not be sufficient to oppose a motion for summary judgment, in assessing cumulatively all of the evidence presented by Simonis and viewing the evidence in the light most favorable to Simonis, I

---

[1] In addition, Simonis testified that shortly after the decision to promote Fisher was made, he heard someone say "I just saw Simonis up there, wasn't he supposed to come to the Right-of-Way Department?" And the response was "No, they don't want that old fucker up here, he needs to just retire." [DE 28-20 at 1.] Simonis does not know who the speakers were and the City argues that these statements are inadmissible hearsay. I do not need to rule on the admissibility of this testimony today because I have already found that summary judgment should be denied without considering it.

find that it permits a reasonable factfinder to determine that the City's decision to give the position to Fisher rather than Simonis was attributable to Simonis' age.

## Conclusion

For the aforementioned reasons, the Defendant's Motion for Summary Judgment is **DENIED**. [DE 25.]

**SO ORDERED.**

ENTERED: May 10, 2017.

                                       s/ Philip P. Simon
                                      **PHILIP P. SIMON, JUDGE**
                                      **UNITED STATES DISTRICT COURT**